IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
NORFOLK DIVISION



**UNITED STATES OF AMERICA**

v.  CRIMINAL NO. 2:18cr95

**SHELDON MYERS,**

    **Defendant.**

## MEMORANDUM OPINION

The defendant, Sheldon Myers ("Defendant"), is charged with two counts in the pending criminal indictment: conspiracy to distribute and possess with intent to distribute fentanyl, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(C) and 846 (Count One), and possession with intent to distribute fentanyl, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C) (Count Two). ECF No. 14. On July 5, 2018, Defendant filed a Motion to Suppress asking the Court to exclude from trial all evidence obtained as a result of his detention during a traffic stop and subsequent arrest on February 1, 2018, in Norfolk, Virginia. ECF No. 19. On August 9, 2018, the Court conducted a hearing on Defendant's Motion to Suppress and **DENIED** such motion from the bench at the conclusion of the hearing. This Opinion sets forth the Court's reasons for its decision.

    **I.    FACTUAL FINDINGS**

The Interdiction Unit of the Vice and Narcotics Division of the Norfolk Police Department ("NPD") is responsible for stemming the flow of illicit narcotics into the city of Norfolk through the interdiction of couriers at local bus stations, highways, delivery services, and other transportation hubs. In February, 2018, the unit was comprised of one sergeant – Sergeant Keith Winingear – and five investigators: Investigators Gibson, Todd, Jacobs, Jackson, and Roberts.

On the evening of February 1, 2018, the NPD Interdiction Unit conducted surveillance of the New Everyday Bus Company, which is located in a strip mall on the 5900 block of East Virginia Beach Boulevard in Norfolk. Local law enforcement officers colloquially refer to this bus line as the "China Bus" because it offers one-way and roundtrip travel between the Chinatown neighborhood in New York City and Norfolk. The fare is relatively inexpensive and easy to purchase without proof of identification. Members of the NPD Interdiction Unit regularly deploy to this Norfolk bus station for interdiction efforts and, before the night in question, had successfully identified and apprehended multiple individuals using the China Bus to transport illegal narcotics into Norfolk.

At approximately 11:30 p.m., while Sergeant Winingear ("Winingear") was conducting surveillance of the bus station from his unmarked vehicle in the parking lot, he observed a China Bus arrive in the same lot approximately 100 feet away. The parking lot was fairly well-lit at the time. Winingear then observed approximately twenty to thirty passengers disembark the China Bus. He noticed one individual in particular, later identified as the Defendant, who was carrying an unidentified object or parcel in his hand but did not have any luggage. The Defendant then made a call from a cell phone and looked around the parking lot. Within a few minutes, a silver Infiniti arrived in the lot, and the Defendant got into the passenger side of the vehicle. Sergeant Winingear then notified his Interdiction Unit via secure radio channel that the silver Infiniti contained a person of interest as a possible narcotics courier and instructed his unit to follow the vehicle.

After receiving Winingear's instruction, Investigator William Gibson ("Gibson"), who was also parked at the bus station lot in a separate unmarked vehicle, observed the silver Infiniti leaving the bus station parking lot. The Infiniti passed directly in front of Gibson's unmarked

vehicle, at which time Gibson observed the front passenger side window of the Infiniti. Gibson testified that the window appeared to him to have excessive tinting in violation of Virginia law. Gibson then stated he could not see inside the vehicle or observe any occupants thereof.

Gibson, along with other members of his unit, then followed the Infiniti in their respective unmarked vehicles. The Infiniti first entered Virginia Beach Boulevard heading east toward Newtown Road where it turned left. After driving approximately two miles, the Infiniti stopped at a 7-11 convenience store on the left-hand side of Newtown Road. Gibson noticed that the Infiniti had already passed two 7-11 convenience stores earlier in the route, both of which were located on the right-hand side of Virginia Beach Boulevard. After a short time at the 7-11, the Infiniti entered Newtown Road and retraced its original route back toward the shopping center where the bus originally stopped. The Infiniti eventually passed said shopping center at the 5900 block of East Virginia Beach Boulevard, and then took a left on Military Highway, traveled approximately three-quarters of a mile, and then entered interstate 264 West ("264-W") using the on-ramp on Military Highway. Gibson noticed that the Infiniti could have entered interstate 264-W earlier by a more direct route if it had continued straight on Newtown Road after leaving the 7-11 where it had previously stopped.

The Interdiction Unit continued to follow the Infiniti on interstate 264-W for approximately four miles. During this time, Gibson tried to confirm his suspicion that the Infiniti's front passenger-side window was unlawfully tinted by driving next to the Infiniti in an adjacent lane. While driving next to the Infiniti, Gibson paced the vehicle traveling at 60 mph in a 55-mph zone. He then signaled for the Infiniti to pull over and effectuated a traffic stop near the Brambleton Avenue exit on interstate 264-W. During the traffic stop, Gibson parked directly behind the Infiniti on the side of the interstate 264-W. The other members of his Interdiction

Unit arrived at the scene and parked nearby in their separate vehicles. Sergeant Winingear and Investigators Gibson, Todd, and Jacobs each had their narcotics-detection dogs in the back of their respective vehicles at the scene.

After the Infiniti stopped, Gibson exited his vehicle to make contact with the driver of the Infiniti. Investigator Donald Todd ("Todd"), who assisted Gibson with the traffic stop, approached the front passenger side of the vehicle where the Defendant was sitting. As Gibson approached the rear of the Infiniti, he smelled marijuana prior to making contact with the driver. Gibson then asked the driver for his license, which the driver gave to Gibson. Gibson and Todd then ordered both occupants to step out of the car. Although Todd did not smell marijuana as he approached the Infiniti, he smelled it when the passenger door was opened. Photographs of the scene show that the sunroof of the Infiniti was open and that at least one of the investigators was dressed in a hooded sweatshirt with the hood over his head. Gibson also testified that it was chilly that night.

After the occupants were secured outside of the vehicle, Gibson conducted a search of the vehicle based on the odor of marijuana he detected. During the search, Gibson found a blue Honey Maid graham cracker box on the floorboard behind the front passenger seat. The box contained a brick-like substance in a vacuum-sealed plastic bag. Gibson conducted a field test of the substance and determined that it was fentanyl, a schedule II controlled substance.[1] None of the four narcotics-detection dogs present at the scene was deployed for sniff tests.

In addition to the fentanyl, Gibson also seized a cell phone in the driver's seat, two cell phones in the locked glovebox, and a loaded 9mm pistol in the trunk. The driver claimed ownership of all such items. Investigator Todd conducted a search of Defendant and recovered a

---

[1] According to the Government, later forensic analysis confirmed that the substance contained 313.3 grams of fentanyl. Opp. Br., ECF No. 21, at 3.

black ZTE cell phone and approximately $1,800 in cash from Defendant's person. No marijuana or marijuana paraphernalia was recovered from the vehicle, the driver, or the Defendant.

At some point during the traffic stop, Gibson requested a tint meter to confirm his suspicion about the illegal tinting of the passenger side window of the Infiniti. After the search of the car was completed, a Virginia state trooper arrived at the scene with the requested tint meter and showed Gibson how to calibrate and use it. Gibson then used the meter on the Infiniti's front passenger window per the state trooper's instructions. The meter had a reading of 17, which indicates a light transparency between 15% and 19%. Virginia law requires a minimum of 50% light transparency for front passenger windows.[2]

Defendant was arrested based on the fentanyl discovered in the vehicle and was eventually transported to the NPD Operations Center for questioning. At approximately 12:55 a.m. on February 2, 2018, Defendant waived his Miranda rights and thereafter made certain incriminating statements to law enforcement.

## II.  LEGAL STANDARD

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "The suppression or exclusionary rule is a judicially prescribed remedial measure" used to deter Fourth Amendment violations. Segura v. United States, 468 U.S. 796, 804 (1984). "[T]he exclusionary rule reaches not only primary evidence obtained as a direct result of an illegal search or seizure, . . . but also evidence later discovered and found to be derivative of an illegality or 'fruit of the poisonous tree.'" Id. (internal citations and quotations omitted).

---

[2] Section 46.2-1052 of the Virginia Code states in relevant part: "No sun-shading or tinting films may be applied or affixed to the front side windows of any motor vehicle operated on the highways of the Commonwealth that reduce total light transmittance of such window to less than 50 percent[.]" Va. Code Ann. § 46.2-1052(C)(3). Any person who violates such provision "is guilty of a traffic infraction." Id. § 46.2-1052(C)(3).

5

However, suppression of evidence must be the Court's "last resort, not [its] first impulse." Hudson v. Michigan, 547 U.S. 586, 591 (2006). "The exclusionary rule generates 'substantial social costs,' . . . which sometimes include setting the guilty free and the dangerous at large." Id. (internal quotation omitted). Therefore, the rule only applies "where its remedial objectives are thought most efficaciously served[.]" Id. (internal quotation omitted).

Because warrantless searches and seizures are generally presumed to be unreasonable under the Fourth Amendment, the Government bears the burden of proving by a preponderance of the evidence that such search or seizure is lawful. United States v. Napan, 769 F. Supp. 2d 969, 971 n.2 (E.D. Va. 2011) (citing Coolidge v. New Hampshire, 403 U.S. 443, 455 (1971) ("The burden is on those seeking the exemption [from the Fourth Amendment's restrictions on searches] to show the need for it.")).

### III. DISCUSSION

In his Motion to Suppress, Defendant argues that the traffic stop of the silver Infiniti on the evening of February 1, 2018, constituted an unreasonable seizure in violation of the Fourth Amendment and that all evidence obtained as a result of such stop must be suppressed. Defendant also argues that, even if the traffic stop was initially justified, the prolonged detention of Defendant was unlawful because the officers extended the traffic stop beyond its reasonable scope based on the false pretext of smelling marijuana. Lastly, Defendant argues that the officers lacked probable cause to arrest him. The Court shall address each argument in turn.

#### A. The Traffic Stop Was Justified at its Inception.

"A traffic stop constitutes a 'seizure' under the Fourth Amendment and is subject to review for reasonableness."[3] United States v. Hill, 852 F.3d 377, 381 (4th Cir. 2017) (citation

---

[3] A passenger in a vehicle stopped by law enforcement is "seized" within the meaning of the Fourth Amendment and thus has standing to challenge to the legality of the stop. Brendlin v. California, 551

6

omitted). "Because an ordinary traffic stop is more analogous to an investigative detention than a custodial arrest," the Fourth Circuit applies the two-prong test announced in Terry v. Ohio, 392 U.S. 1, 19–20 (1968), when analyzing the propriety of a traffic stop. United States v. Green, 740 F.3d 275, 279 (4th Cir. 2014) (internal citation omitted). Using this test, the Court must determine [1] "whether the officer's action was justified at its inception, and [2] whether it was reasonably related in scope to the circumstances which justified the interference in the first place." United States v. Rusher, 966 F.2d 868, 875 (4th Cir. 1992) (quoting Terry, 392 U.S. at 20).

With respect to the first prong, a traffic stop is justified at its inception "whenever it is lawful for police to detain an automobile and its occupants pending inquiry into a vehicular violation." Arizona v. Johnson, 555 U.S. 323, 327 (2009). "Without question, such a violation may include failure to comply with traffic laws." United States v. Palmer, 820 F.3d 640, 649 (4th Cir. 2016). Stopping a vehicle to investigate a traffic infraction must be reasonable under the circumstances. Whren v. United States, 517 U.S. 806, 809 (1996). Such a stop is reasonable "if it is justified by probable cause or reasonable suspicion." United States v. Johnson, 734 F.3d 270, 275 (4th Cir. 2013). "[The Court] simply ask[s] whether 'the circumstances, viewed objectively, justify th[e] action.'" Palmer, 820 F.3d at 649 (citation omitted). "The standard is met, therefore, when officers observe a traffic violation, regardless of their true, subjective motives for stopping the vehicle." Johnson, 734 F.3d at 275.

In this case, Investigator Gibson testified that he initiated the traffic stop of the Infiniti for two reasons: (1) he suspected that the tinting on the front passenger window was in violation of Virginia law, and (2) he determined, using the speedometer in his own vehicle, that the Infiniti traveled 60 mph on interstate 264-W, which exceeded the posted speed limit (55 mph) for that

---

U.S. 249, 259 (2007).

roadway. There is no question that both speeding and driving with excessively-tinted windows, as defined by statute, constitute traffic violations under Virginia law, and that observing either violation would constitute a lawful basis for a traffic stop. See Palmer, 820 F.3d at 650 ("[I]llegally tinted windows are alone 'sufficient to justify' a traffic stop."). Therefore, the issue is whether it was objectively reasonable for Gibson to stop the vehicle on that basis.

As an initial matter, the Court found Gibson's testimony that he stopped the Infiniti on the basis of these two suspected traffic violations to be credible and consistent with his written report on the incident in question. Furthermore, based on the totality of the circumstances, the Court found that Gibson reasonably believed that he observed these traffic violations. First, with respect to the window tint, Gibson initially viewed the front passenger window when the Infiniti picked up the bus passenger (the Defendant) in the shopping center parking lot. Sergeant Winingear testified that this parking lot was well-lit despite the late hour as shown in the photographs of same. See 8/9/2018 Hr'g Transcript ("Tr."), ECF No. 32, at 29:1–2; Gov't Exs. 1 and 2. Therefore, an experienced police officer, such as Gibson, would have been able to identify excessive window tinting under the same circumstances. Second, based on the evidence before the Court, it appears that whether the front passenger window was unlawfully tinted was not a close call. Gibson testified that he was unable to see the vehicle occupants through the tinted window. Tr. at 49:15–17. Moreover, when Gibson later tested the window with a tint meter, the meter indicated a light transparency of approximately 17%, which is 33% below the level authorized under Virginia law for such windows. Gov't Exhibit 6; see supra n.2.

At the hearing, defense counsel argued that the tint meter reading at the scene was unreliable because there is no evidence that Gibson was properly trained to use the meter or that such meter was properly calibrated. Indeed, Gibson admitted during the hearing that it was

likely the first time he had ever used a tint meter and he did not know whether it was properly calibrated; he only knew that attempts were made at the scene to calibrate it. Tr. at 88:1–4, 90:17–91:4. However, regardless of whether the tint meter gave an objectively accurate reading of the window tint that night, the Court found that the low transparency level it reported (1) increases the likelihood that the window was in fact unlawfully tinted, (2) corroborates Gibson's claim that the window appeared unlawfully tinted, and (3) suggests that Gibson's suspicion of same was reasonable.

With respect to Gibson's belief that the Infiniti was speeding on interstate 264-W, Gibson admitted during the hearing that the speedometer in his unmarked vehicle on the night in question was not previously calibrated, nor was the calibration verified afterward. Tr. at 80:13–17. In view of these concessions, the candidness of his answers, and his demeanor on the stand, the Court found that Gibson's testimony with respect to the suspected speeding was credible and found that the basis of such suspicion was reasonable. Regardless, Gibson's reasonable suspicion of the unlawful window tinting alone was sufficient justification for the traffic stop. See Palmer, 820 F.3d at 650. Therefore, even if Gibson did not have reasonable grounds to believe the Infiniti was speeding, the traffic stop was still justified at its inception on the basis of the suspected window-tint infraction.

### B. The Traffic Stop Was Lawfully Prolonged after Law Enforcement Smelled Marijuana Emanating from the Vehicle.

Terry's second prong requires the Court to determine whether the officers' conduct during the traffic stop was reasonably related in scope to the circumstances justifying the stop in the first instance. Rusher, 966 F.2d at 875 (citing Terry, 392 U.S. at 20). "A legitimate traffic stop may 'become lawful if it is prolonged beyond the time reasonably required' to complete it initial objectives." Palmer, 820 F.3d at 649 (quoting Illinois v. Caballes, 543 U.S. 405, 407

(2005)). Here, these objectives included addressing the traffic violation that warranted the stop, such as by issuing a ticket, and attending to related safety checks. Rodriguez v. United States, _ U.S. _, 135 S. Ct. 1609, 1614 (2015) (internal citations omitted). A law enforcement officer may only extend the scope or duration of the traffic stop if "he receives the motorist's consent or develops reasonable, articulable suspicion of ongoing criminal activity." Palmer, 820 F.3d at 649–50. Even if an officer develops such reasonable suspicion to expand the mission of the stop, he may not search the stopped vehicle unless he obtains consent, a warrant, or probable cause to believe the vehicle contains evidence of criminal activity. Id. at 650. If an officer smells marijuana emanating from a vehicle, he has probable cause to search the interior of such vehicle without warrant. United States v. Carter, 300 F.3d 415, 422 (4th Cir. 2002); see also Palmer, 820 F.3d at 650.

In his Motion to Suppress, Defendant argues that the NPD Interdiction Unit prolonged the initial seizure of Defendant beyond the permissible scope of the traffic stop by creating a false pretext that the officers smelled marijuana. The issue before the Court is whether the Government has shown by a preponderance of the evidence that the seizure of Defendant during the pendency of the traffic stop on February 1, 2018, was at all times reasonable within the meaning of the Fourth Amendment. For the reasons below, the Court found that the Government has met its burden.

First, the evidence shows that Investigator Gibson smelled marijuana emanating from the car before the initial objectives of the traffic stop could have reasonably been completed. During the suppression hearing, Gibson testified that, within minutes of effectuating the traffic stop of the Infiniti, Gibson – who was parked directly behind the Infiniti – exited his vehicle in order to make contact with the driver. Tr. at 58:8–14. Immediately upon approaching the rear of the

Infiniti, he smelled marijuana. Id. Gibson also testified that he immediately communicated such detection to Investigator Todd, who was assisting with the stop. Id. at 62:1–3. Notably, Gibson's testimony is consistent with his description of the traffic stop contained in his written report on the incident. See Gibson Report, ECF No. 19-1, at 3. Furthermore, Investigator Todd's testimony corroborates Gibson's claim regarding the marijuana odor. Todd testified that, as Gibson approached the rear driver side of the Infiniti, Gibson communicated to Todd that he smelled marijuana. Tr. at 93:22–23, 95:21–23. Todd also testified that he, Todd, smelled an odor of marijuana emanating from inside the vehicle after he opened the front passenger side door. Id. at 94:4–8.

Gibson's account is further corroborated by the fact that the Infiniti's sunroof was open at the time of the stop. See Gov't Exhibit No. 3. Although the Government did not present evidence of the air temperature that night, a photograph of the traffic stop depicts one of the investigators wearing a thick hooded sweatshirt with the hood over his head, which suggests that the weather was cold. Id. Gibson also testified that it was "chilly." Tr. at 48:23. The Court agrees with Investigator Gibson's assessment that an open sunroof in chilly temperatures in the middle of winter is unusual and is consistent with vehicle occupants trying to release odor and smoke from the vehicle while smoking inside. See Tr. at 60:6–8. Therefore, the open sunroof lends credibility to Gibson's claim that he smelled marijuana.

Importantly, the defense did not present any evidence that contradicted Gibson's or Todd's claims that they smelled marijuana during the traffic stop. Instead, the defense argued that such claims were unreliable in view of the totality of the circumstances. In support, the defense pointed to several factors, including, inter alia, that (1) no marijuana or any indicia of marijuana was ever recovered from the Infiniti or its occupants; (2) both Gibson and Todd

admitted that they did not smell marijuana on the driver or the Defendant; (3) the Interdiction Unit had the express goal of trying to obtain probable cause to search the Infiniti for drug related contraband; (4) the unit followed the Infiniti for several miles before Gibson effectuated the traffic stop, even though he suspected illegal window tinting when he first viewed the Infiniti in the bus station parking lot; and (5) none of the four drug-sniffing canines present at the scene was deployed to screen the Infiniti for drugs.

However, after considering all the evidence, the Court ultimately found that Gibson's and Todd's unrebutted testimony regarding the marijuana odor was credible. In addition to the corroborating evidence addressed above, Gibson appeared to be direct and candid throughout his testimony. He readily admitted when he did not know or recall something even when such testimony was not favorable to the Government. For instance, Gibson admitted that he had likely never used a tint meter prior to traffic stop in question, Tr. at 88:3–4, and was not sure if it was properly calibrated, id. at 87:23–25. He also admitted that he did not smell any marijuana on the person of the Defendant or the driver. Id. at 83:25–84:5. In addition, there was no reason to deploy the drug-detection dogs at the scene because Gibson and Todd had smelled marijuana. Therefore, the Court did not find Gibson's justification for extending the traffic stop to be a "false pretext" as the Defendant claims.

Moreover, the case cited by the Defendant, United States v. Dolson, 673 F. Supp. 2d 842 (D. Minn. 2009), is easily distinguished from the facts of this case. In Dolson, the officer who effectuated a traffic stop of a vehicle testified during the suppression hearing that he smelled the odor of burnt marijuana as he approached the vehicle during the stop. 673 F. Supp. 2d at 848. The Dolson court ultimately found that this claim was not credible because it was inconsistent with the officer's behavior and recorded statements during the stop. Id. at 858–59. For example,

during the stop, in a recorded phone call to another officer, the officer in question failed to mention smelling marijuana despite listing other grounds for suspicion, including the driver's apparent "nervousness." Id. at 859–60. The Dolson court found that there was no plausible explanation for the officer omitting such a pertinent fact if it were true. Id. at 860.

Here, by contrast, there is no evidence showing that Investigator Gibson's behavior during the traffic stop contradicts or otherwise discredits his later testimony about smelling marijuana. As stated previously, such testimony is consistent with his written report on the matter. Moreover, both Gibson and Todd testified that Gibson immediately communicated to Todd that he, Gibson, smelled marijuana as he approached the Infiniti. Gibson did not remain silent about the alleged marijuana odor as the officer did in Dolson. Therefore, the factors which served to diminish the credibility of the officer's testimony in Dolson are not present here, and the Court found Gibson's testimony regarding his detection of marijuana odor to be credible.

For these reasons, the Government has shown by a preponderance of the evidence that the traffic stop of the Infiniti was at all times lawful. Almost immediately upon effectuating the lawful purposes of the traffic stop, Investigator Gibson smelled marijuana emanating from the vehicle, which gave him probable cause to believe that illegal drug activity and evidence thereof was located inside the car. With such probable cause, law enforcement was authorized to expand the investigatory scope of the stop, to search the car, and to detain Defendant during the pendency of same. Palmer, 820 F.3d at 650. Therefore, Defendant's claim that law enforcement unlawfully extended the traffic stop and the seizure of his person by using the pretext of marijuana odor is without merit.

C. Law Enforcement Had Probable Cause to Arrest Defendant.

Lastly, Defendant argues that, regardless of the lawfulness of the traffic stop, law enforcement lacked probable cause to arrest the Defendant for a drug-related offense.

13

Accordingly, Defendant argues that all evidence seized from his person as well as the statements he made as a result of his unlawful arrest should be suppressed. The Government responds that law enforcement had probable cause to arrest Defendant when Investigator Gibson discovered the graham cracker box containing a large quantity of fentanyl behind the passenger seat of the Infiniti. For the reasons below, the Court agrees with the Government.

"A warrantless arrest of an individual in a public place for a felony . . . is consistent with the Fourth Amendment if the arrest is supported by probable cause." Maryland v. Pringle, 540 U.S. 366, 370 (2003) (citing United States v. Watson, 423 U.S. 411, 424 (1976)). "Probable cause" sufficient to justify an arrest requires "facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." Michigan v. DeFillippo, 443 U.S. 31, 37 (1979). "The belief of guilt must be particularized" with respect to the person to be arrested. Pringle, 540 U.S. at 371 (citing Ybarra v. Illinois, 444 U.S. 85, 91 (1979)). "Determining whether the officer has probable cause involves an inquiry into the totality of the circumstances." United States v. Humphries, 372 F.3d 653, 657 (4th Cir. 2004) (citing Pringle, 540 U.S. at 370). "[T]he inquiry does not involve the application of a precise legal formula or test but the commonsense and streetwise assessment of the factual circumstances[.]" Id.

Here, when viewing the totality of the circumstances, it was reasonable for the Interdiction Unit to believe that Defendant had committed or was committing a drug crime at the time he was arrested. First, Investigator Gibson discovered the graham cracker box containing fentanyl directly behind and under the front passenger seat where Defendant was sitting. Given the location of the fentanyl and the small size of the vehicle, the drugs were readily accessible to

the Defendant such that it was reasonable to believe he had knowledge of and control over it. See Pringle, 540 U.S. at 372 (finding it reasonable to believe that all three occupants of the vehicle had access to and control over the five plastic baggies of cocaine located behind the back-seat armrest). Second, the Interdiction Unit had previously observed the Defendant disembark from the China Bus at 11:30 p.m. carrying only one object or parcel in his hand, with no luggage, before getting into the Infiniti. Notably, the China Bus travels from Chinatown in New York City, a known source city for drugs, and the Interdiction Unit knew that such bus line had been used for illegal drug trafficking in the past. Third, immediately after the Infiniti picked up Defendant at the bus station, the Infiniti traveled an unusual and winding route, which reasonably suggested to Investigator Gibson that the occupants were concerned that they were being followed by law enforcement. Finally, the fact that the officers found several cell phones in the vehicle, a loaded firearm in the trunk, and $1,800 in cash on Defendant's person "indicated the likelihood of drug dealing" and reasonably suggested to the officers that Defendant was involved in a "common enterprise" with the driver and was not merely an unwitting passenger. Pringle, 540 U.S. at 373.

Notwithstanding these factors, the Defendant relies on Ybarra and other guilt-by-association cases to argue that the officers lacked probable cause particularized to the Defendant necessary to justify his arrest. Mot., ECF No. 19, at 9 (citing, e.g., Ybarra, 444 U.S. at 92–93). However, like the Supreme Court in Pringle, this Court found Defendant's reliance on these cases unavailing. Here, the officers did not arrest the Defendant based on his "mere propinquity" to the driver or to the contraband belonging to the driver. See Mot., ECF No. 19, at 11. Rather, the officers obtained probable cause to arrest the Defendant based on his proximity to and ability to access the fentanyl when viewing such proximity against the totality of the circumstances

from the time he disembarked from the China Bus with no luggage, as discussed above.

In sum, upon consideration of all the evidence, the Court found that law enforcement had probable cause to believe that the Defendant committed a felony drug crime at the time he was arrested. Therefore, his arrest was reasonable within the meaning of the Fourth Amendment, and the exclusionary rule does not apply.

## IV. CONCLUSION

For the foregoing reasons, the Court found that the seizure and subsequent arrest of Defendant on February 1, 2018, were at all times reasonable and did not violate the Defendant's Fourth Amendment rights. Therefore, Defendant's Motion to Suppress, ECF No. 19, was **DENIED**.

The Clerk is **DIRECTED** to forward a copy of this Opinion to all Counsel of Record.

**IT IS SO ORDERED**.

/s/
Robert G. Doumar
Senior United States District Judge

UNITED STATES DISTRICT JUDGE

Norfolk, VA
August __, 2018